

**ATTORNEY FOR APPELLANT**

Lisa M. Johnson
Brownsburg, Indiana

**ATTORNEYS FOR APPELLEE**

Gregory F. Zoeller
Attorney General of Indiana

Christina D. Pace
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Carlton Hart,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

May 15, 2015

Court of Appeals Case No.
49A05-1404-CR-191

Appeal from the Marion Superior
Court

The Honorable Lisa F. Borges,
Judge

Lower Court Cause No.
49G04-1211-MR-80845

**Pyle, Judge.**

# Statement of the Case

Carlton Hart ("Hart") appeals his convictions, after a jury trial, for murder,[1] Class B felony criminal confinement,[2] and Class B felony conspiracy to commit criminal confinement.[3] On appeal, Hart argues that the evidence was insufficient to support his convictions as an accomplice and that the trial court erroneously allowed the State to redact details of a peace treaty he brokered between rival rap groups from his statements to police. Concluding that the evidence supported Hart's convictions as an accomplice and that the trial court did not err in excluding the details of the peace treaty, we affirm Hart's convictions.

We affirm.

# Facts

On November 11, 2012, Hart's cousin, Brandon McMitchell (a.k.a. "Bango"), a rapper, was shot and killed. Hart owned a music recording studio in Indianapolis, and, on November 15, 2012, he allowed James McDuffy ("McDuffy") to use his studio, ostensibly to arrange a tribute mixtape for

---

[1] IND. CODE § 35-42-1-1.

[2] IND. CODE § 35-42-3-3. We note that, effective July 1, 2014, a new version of this criminal confinement statute was enacted and that Class B felony criminal confinement is now a Level 3 felony. Because Hart committed his crimes in 2012, we will apply the statute in effect at that time.

[3] IND. CODE §§ 35-41-5-2; 35-42-3-3.

Bango. In truth, the intention was to question Marvin Finney ("Finney") and Thomas Keys ("Keys"), two local deejays, about Bango's murder.

[4] Prior to the meeting, Hart, McDuffy, and Darin Jackson ("Jackson") went to a Lowes hardware store around 3:00 p.m. Brandon Pothier ("Pothier"), a loss prevention manager at Lowes, started observing McDuffy because he first selected a box cutter, a common tool used by shoplifters to open and take items. Pothier then observed McDuffy and Jackson near zip ties, and the men made motions crossing their wrists in front of their bodies. Hart, McDuffy, and Jackson purchased a 2x4 piece of lumber, a package of zip ties, three 12x2 flat washers, the box cutter, duct tape, and four open bar door holders. Hart, Jackson, and McDuffy then returned to the studio. Hart later took Jackson to work and then picked up his daughter, leaving McDuffy at the studio.

[5] Finney picked Keys up in his mother's minivan and drove to the studio, arriving at about 5:00 p.m. They were greeted by Dontee Robinson ("Robinson"), an associate of McDuffy's who was at the studio. Finney was familiar with Robinson through music videos on YouTube. McDuffy and Keys began talking and exchanging telephone numbers, but the conversation shifted to McDuffy asking Keys about Bango's homicide. Keys denied knowing anything about the murder.

[6] Meanwhile, Finney sent text messages and waited for the music to start. Finney then noticed an unknown man walking around the backdoor area who was short with a light-skin complexion and slanted eyes. McDuffy told Finney,

"you all are not leaving here until you all tell us what we need to know." (Tr. 128).

[7] McDuffy looked through Finney's phone to see who he had been texting, and Robinson looked through Keys's phone. McDuffy pulled out a handgun from his jacket and sat it in his lap. McDuffy and Robinson then patted Finney and Keys down and took their wallets, keys, and jackets. Finney attempted to exit through a back door, but the unknown man pointed a chrome revolver at him and told him to sit down. Keys and Finney were then tied up with duct tape and zip ties.

[8] Dominique Hamler ("Hamler") eventually came into the studio through the back door. He pointed an assault rifle at Keys and Finney and asked, "which one of you all killed Bango?" (Tr. 136). Another man, Nathaniel Armstrong ("Armstrong") came through the back door, grabbed the box cutter, and slashed Keys's leg. An older bald-headed man, who Finney did not recognize, also came into the studio, looked at a phone, pointed to Keys, and said, "that's him." (Tr. 145-46).

[9] Finney's phone kept ringing with calls from his mother and his girlfriend. Finney's mother then sent a message stating that if he did not return her van, she would call the police. McDuffy then said, "we need to go ahead and get gloves and finish this." (Tr. 147).

[10] Hamler, Robinson, Armstrong, and the older man came back with black and brown work gloves. Someone put duct tape over Keys's and Finney's faces and

zip ties around their necks. The lights were turned out, the group left the room, and then one of the men came back and shot a firearm into the room. A bullet struck Finney in the wrist, and he acted as if he were dead. Once the shooting stopped and Finney thought the room was clear, he freed himself and told Keys that they needed to leave; Keys did not respond.

[11] Finney, with duct tape and zip ties still on his body, ran down the street to a CVS store where he sought help and tried to remove the remaining zip ties and duct tape from his neck. Finney told people in front of the store and the responding officers that he had been shot at the studio and that Keys was still there. Officers went to the music studio and found Keys's body inside. Keys had been shot several times, including what was later determined to be a fatal gunshot to his chest.

[12] While Indianapolis Metropolitan Police Detective Brian Schemenaur ("Detective Schemenaur") was at the studio, Hart arrived and stated that he was the owner. Detective Schemenaur had Hart transported to the homicide office for an interview. Hart was interviewed a total of four times.

[13] During Hart's first statement on the day of the murder, Hart told Detective Schemenaur that he had received a phone call to come to his studio because police officers had it surrounded. Hart also told Detective Schemenaur that he did not know Keys or Finney and that he was not expecting anyone to be in his studio.

[14] About two weeks later on November 26, Hart gave a second statement and told Detective Schemenaur that he had been receiving threats. Specifically, Hart stated that someone had been calling his phone repeatedly but would not say anything. Hart also told the detective there was a rumor that Keys's murder was in retaliation for Bango's murder. Detective Schemenaur showed Hart some photos, and McDuffy's was one of the photos he recognized. However, Hart told Detective Schemenaur that he had not seen McDuffy for about four weeks.

[15] Hart's third statement took place on November 29. In this statement, Hart mentioned talking to McDuffy the day of the murder. Hart told Detective Schemenaur that McDuffy was already in his studio the day of the murder, and that he and Jackson went to the studio once he received the phone call from McDuffy. The detective told Hart that he knew that he was leaving critical details out of his statement. Yet, Hart maintained that he was telling the detective everything he knew.

[16] On the same day, the State charged Hart with: two counts of murder; Class A felony kidnapping; Class A felony attempted murder; Class A felony robbery; two counts of Class B felony criminal confinement; Class A felony conspiracy to commit kidnapping; and Class B felony conspiracy to commit criminal confinement.

[17] Hart gave his fourth statement to Marion County Sheriff's Deputy Corey McGriff, ("Deputy McGriff") on December 6, 2012. In his fourth statement,

Hart admitted that he had taken McDuffy and Jackson to Lowes and that he had driven the men back to his studio. Hart told Deputy McGriff that he did not tell Detective Schemenaur these details because he was afraid for his life.

[18] A four-day jury trial was held from March 24 through March 27, 2015. Previously on January 21, 2014, the trial court granted the State's motion in liminie allowing the State to redact details surrounding a peace treaty Hart brokered between rival rap groups from his statements to police. The State argued that the peace treaty was not relevant, but Hart wanted to discuss the peace treaty to show his peaceful character. Hart objected to the redacted statements when the State introduced them at trial and incorporated his arguments from prior hearings to preserve the issue for appeal.

[19] In addition to the aforementioned facts, the State used phone records at trial to show that Hart was in contact with McDuffy and Hamler from right before the time Keys and Finney arrived at the studio to one half hour after Finney arrived at the CVS seeking help. Hart testified on his own behalf and stated that he had no idea what was going to take place that day, and that he had only called McDuffy multiple times to get him out of his studio. The jury found Hart guilty of murder, criminal confinement, and conspiracy to commit criminal confinement, and not guilty of the remaining counts. Hart now appeals.

# Discussion

[20] Hart makes two arguments on appeal. First, he claims that the evidence is insufficient to support his convictions as an accomplice. Specifically, he argues

that the circumstantial facts used to secure his convictions "are all equally susceptible to inferences which are consistent with [his] innocence." (Hart's Br. 9). Second, he claims the trial court committed reversible error by excluding evidence of a peace treaty he brokered between two rival rap groups, claiming that it would have displayed his peaceful character. We address each of his arguments in turn.

### 1. Sufficiency of Evidence

Hart argues that the State did not prove that he knowingly or intentionally aided, induced, or caused others to confine Finney and confine and kill Keys.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences *supporting* the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the [jury's verdict]. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (internal quotation marks, citations, and footnote omitted) (emphasis in original).

At trial and on appeal, the State argued that Hart was guilty of the charged offenses as an accomplice. To convict Hart of murder and criminal

confinement as an accomplice, the State was required to prove beyond a reasonable doubt that he knowingly or intentionally aided, induced or caused another person to confine and kill Keys. *See* IND. CODE § 35-41-2-4. To convict Hart of conspiracy to commit criminal confinement, the State had to prove that he agreed with Armstrong, McDuffy, Robinson, Hamler, and/or Jackson to commit the crime of criminal confinement and performed an overt act in furtherance of the agreement. *See* I.C. §§ 35-41-5-2; 35-42-3-3.

[24] It is well established that a person who aids another in committing a crime is just as guilty as the actual perpetrator. *Vandivier v. State*, 822 N.E.2d 1047, 1054 (Ind. Ct. App. 2005), *trans. denied*. To be convicted as an accomplice, it is not necessary for a defendant to have participated in every element of the crime. *Bruno v. State*, 774 N.E.2d 880, 882 (Ind. 2002), *reh'g denied*. While mere presence at the scene of the crime is not sufficient to establish accomplice liability, presence may be considered along with the defendant's relation to the one engaged in the crime and the defendant's actions before, during, and after the commission of the crime. *Alvies v. State*, 905 N.E.2d 57, 61 (Ind. Ct. App. 2009).

[25] Here, the evidence most favorable to the verdict shows that: (1) before the crime, Hart took McDuffy and Jackson to Lowes where they purchased the duct tape and zip ties used to confine Keys and Finney; (2) the murder and confinement took place in Hart's studio; and (3) during the approximate time of Keys's and Finney's confinement, Hart was not present at the scene but placed and received numerous calls to and from McDuffy and Hamler.

[26] In addition, the jury was free to consider Hart's behavior after the crime when he gave multiple conflicting interviews to detectives. During Hart's first two interviews with Detective Schemenaur, Hart did not mention McDuffy, Jackson, or himself going to Lowes and coming back to the studio. Instead, Hart claimed that McDuffy was already at the studio that afternoon. During the third interview, Detective Schemenaur confronted Hart about leaving out significant details, but Hart maintained he was telling the detective everything. It was not until Hart's fourth statement—after being placed in custody and having access to the probable cause affidavit—that Hart admitted to going to Lowes and having contact with McDuffy and Hamler that day.

[27] As previously stated, Hart claims that the circumstantial facts used to secure his convictions "are all equally susceptible to inferences which are consistent with [his] innocence." (Hart's Br. 9). Indeed, the jury heard Hart's four statements, and Hart testified on his own behalf, offering his explanation for the inconsistencies. In the end, the jury weighed Hart's credibility in light of the evidence and chose to convict. Hart's argument on appeal is simply a request to reweigh the evidence and his credibility, which we will not do. *See Drane*, 867 N.E.2d at 146-47.

[28] Based on the above-mentioned facts, the jury could have reasonably inferred that Hart aided, induced, or caused the resulting confinement of Finney and the confinement and murder of Keys.

## 2. Exclusion of Character Evidence

[29] At a pretrial hearing on the State's motion in limine, the Court granted the State's request to redact statements made by Hart about a peace treaty that he brokered from his interviews with Detective Schemenaur. The State moved to exclude the details of the peace treaty on relevancy grounds, while Hart objected to the redactions and wanted to testify about the peace treaty to show his peaceful character. Hart claims that the trial court erred in excluding the details of the peace treaty in violation of the "completeness doctrine."

[30] The trial court has broad discretion in ruling on the admission or exclusion of evidence. *Sallee v. State*, 785 N.E.2d 645, 650 (Ind. Ct. App. 2003), *trans. denied*, *cert. denied*. A trial court's ruling on the admissibility of evidence will be disturbed on review only upon a showing of an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented. *Platt v. State*, 589 N.E.2d 222, 229 (Ind. 1992).

[31] Indiana Evidence Rule 106 embodies the "completeness doctrine." *Sanders v. State*, 840 N.E.2d 319, 322 (Ind. 2006). It provides that, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that *in fairness* ought to be considered at that time." Ind. Evidence Rule 106 (emphasis added). The doctrine's purpose "is to provide context for otherwise isolated comments when fairness requires it." *Sanders*, 840 N.E.2d at 323 (quoting *Evans v. State*, 643 N.E.2d 877, 882 (Ind. 1994), *reh'g denied*). A

court need not admit the remainder of the statement, or portions thereof, that are neither explanatory of nor relevant to the portions already introduced. *Id.*

[32] Here, Hart wanted to use the "completeness doctrine" to introduce details of the peace treaty he had organized as a means of showing his peaceful character. However, the admitted portions of his police statements already contained his assertions that he was a peaceful, harmless person. In addition, the peace treaty took place almost five months before the shooting in his studio, and there is no showing that either Finney or Keys were members of the rival groups involved in the treaty. Thus, details about the peace treaty are irrelevant and unnecessarily add details that are likely to confuse the issues. Because excluding details about the peace treaty does not alter the context of Hart's other assertions of peaceful character, the trial court did not err in allowing the redactions. *See, e.g., id.* (no error in refusing to admit excluded portion of letter where the redacted material would have added more information, but the context of letter stayed the same).

[33] Sufficient evidence supports Hart's convictions as an accomplice, and the trial court did not err in excluding details of the peace treaty from evidence.

[34] Affirmed.

[35] Barnes, J., and May, J., concur.